UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ELIZABETH BAEZ, *on behalf of D.J.*,

                              Plaintiff,

v.                                                      6:13-CV-142
                                                        (DNH/TWD)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

APPEARANCES:                             OF COUNSEL:

Empire Justice Center                    LOUISE MARIE TARANTINO, ESQ.
*Counsel for Plaintiff*
119 Washington Avenue
2nd Floor
Albany, NY 12210

HON. RICHARD S. HARTUNIAN                TOMASINA DIGRIGOLI, ESQ.
United States Attorney for the           Special Assistant United States Attorney
Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

OFFICE OF GENERAL COUNSEL                STEPHEN P. CONTE, ESQ.
Social Security Administration           Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

        This matter was referred to the undersigned for report and recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Northern District of New York Local Rule 72.3.  This case has proceeded in accordance with

General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Both parties have filed briefs. Oral argument was not heard. For the reasons discussed below, it is recommended that the Court remand this matter to the Commissioner for further proceedings consistent with this Report-Recommendation.

## I.      BACKGROUND AND PROCEDURAL HISTORY

D.J. (herein referred to as "the Child") was five years old at the time of the hearing. (Administrative Transcript ("T.") at 77.[1]) Plaintiff Elizabeth Baez (herein referred to as "the Guardian") alleges the child suffers disability due to Attention Deficit Disorder ("ADHD"), Oppositional Defiance Disorder ("ODD"), asthma, hearing loss, and esotropia, a vision disorder. (T. at 87, 92-93; Dkt. No. 15 at 1.[2])

The Guardian filed an application for disability insurance benefits and SSI on January 24, 2011, on behalf of her minor grandson and ward, the Child. (T. at 165-170.) The application was denied on May 10, 2011. *Id.* at 115-120. The Guardian requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* at 122-126. The hearing was held on April 6, 2012. *Id.* at 62-113. On May 11, 2012, the ALJ issued a decision finding that the Child was not disabled. *Id.* at 19-41. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the Guardian's request for review on December 18, 2012. *Id.* at 1-6. The Guardian commenced this action on February 6, 2013. (Dkt. No. 1.)

---

[1]      Page numbers in citations to the Administrative Transcript (Dkt. Nos. 9-1 - 9-8), refer to the page numbers in the original document.

[2]      Page numbers in citations to Plaintiff's brief refer to the page numbers assigned by the Court's electronic filing system rather than to page numbers in the original document.

## II.      APPLICABLE LAW

### A.      Standard for Benefits

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i). Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") promulgated regulations establishing a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of a disability.  20 C.F.R. § 416.924(a).  First, the ALJ considers whether the child is engaged in "substantial gainful activity."  *Id.* at § 416.924(b).  Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations."  *Id.* at § 416.924(c).  Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment meets, medically equals, or functionally equals a disability listed in the regulatory "Listing of Impairments."  *Id.* at § 416.924(d).

In order to show that an impairment matches a Listing, the child must show that his or her impairment meets all of the specified criteria.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); 20 C.F.R. § 404.1525(d) (2007).  In order to determine whether a child's impairment "functionally equals" a Listing:

> The ALJ must examine the evidence of record and determine a child's level of functioning in "six domains."  The six domains are: acquiring and using information; attending and completing tasks; interacting

and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. If a child has "marked" limitations in two of the domains or an "extreme" limitation in one domain, then his impairments will "functionally equal" the Listings, and he will be found disabled.

*White ex rel. Johnson v. Barnhart,* 409 F. Supp. 2d 205, 207-08 (W.D.N.Y. 2006) (citing 20

C.F.R. § 416.926a(b)(1); 20 C.F.R. § 416.926a(d)).

Social Security Regulation 20 C.F.R. § 416.926a(e)(2), sections (i) and (iii), define

"marked" limitation as follows:

> (i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
>
> *        *        *
>
> (iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score. (*See* paragraph (e)(4) of this section.)

20 C.F.R. § 416.926a(e)(2).

## B.        Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citations omitted).  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner

if the record contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d

773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.    THE CHILD

The Child was five years old at the time of the hearing**.** (T. at 77.)  The Child's mother is

the Guardian's daughter, however the Guardian has been the legal guardian since the Child was

three years old.  *Id.*  Prior to that, the Child's mother was moving "from house to house" with

him so the Guardian petitioned for temporary custody.  *Id.* at 77-78.  The Guardian now has sole

custody of the Child.  *Id.* at 78.

## IV.    THE EVIDENCE

Dr. Proshanta Saha has been the Child's treating pediatrician since 2007.  (T. at 469.)

She diagnosed the Child with mild to moderate asthma, chronic bilateral otitis media with

effusion[3] with bilateral hearing loss, and esotropia[4] of the left eye.  She prescribed albuterol[5] and

referred him to specialists for his esotropia and hearing loss.  *Id*. at 467-477.  Dr. Saha also

treated the Child for ADHD after he was diagnosed, discussed below.  *Id.* at 522-558.

---

[3]      Otitis media with effusion is defined as inflamation of the ear, often with pain, hearing loss, tinnitus (ringing, buzzing, or clicking in the ears), and vertigo as a result of the build-up of non-infected fluid in the middle ear.  *Dorland's Illustrated Medical Dictionary,* 591-592, 1338, 1914 (30th ed. 2003).

[4]      Esotropia is defined as a type of strabismus, a "deviation of the eye which the patient cannot overcome," in which the axis of one eye deviates toward the other, resulting in diplopia (the perception of two images of a single object).  The condition is also called cross-eye.  *Dorland's Illustrated Medical Dictionary,* 525, 644, 1766 (30th ed. 2003).

[5]      Albuterol sulfate is the generic name for Proventil, which is prescribed "for the prevention and relief of bronchial spasms that narrow the airway.  This especially applies to the treatment of asthma."  *The PDR Pocket Guide to Prescription Drugs*, 1185-1189 (Bette LaGow ed., 7th ed. 2005).

The Child was placed in Head Start for pre-kindergarten but was referred to Whispering Pines, a school "equipped for children with disabilities," in October of 2010 because the instructors noticed he was having speech problems. *Id.* at 79-80. The Child completed a year at Whispering Pines, but the Guardian testified that his behavior was deteriorating, and that the instructors had to restrain him for forty minutes at a time, holding down his legs and hands to calm him, while he would bite and spit. *Id.* at 80.

While at Whispering Pines, occupational therapy student Shannon Hinkle and Occupational Therapist Jennifer Greene-Gillooley evaluated the Child. *Id.* at 225-232. They noted he scored in the 3rd percentile for Fine Motor Quotient, observing that "his visual difficulties impacted his overall fine motor development." *Id.* at 231. Additionally, during the evaluation, the child "had difficulty attending, focusing, and blocking out unnecessary sensory input." *Id.* They recommended that the Child would benefit from occupational therapy services. *Id.*

Certified school psychologist Julie Schaller Smith evaluated the Child in response to concerns of his behavior in the classroom. *Id.* at 233-239. Her testing showed that the Child continued to have cognitive and social delays, and limited safety awareness. *Id.* at 237. She recommended several steps classroom staff could take to help manage him in the classroom setting. *Id.*

In March 2011, consultative examiner, Dawn Grasso-Megyeri, a speech and language pathologist, evaluated the Child at the request of the Administration. *Id.* at 27, 457-461. In her medical source statement, she stated that the Child displayed receptive and expressive language skills that were developing within normal limits. *Id.* at 460. She noted that he made articulation

errors during observation, but felt the "errors did not impact on his intelligibility at this time." *Id.*

Ms. Grasso-Megyeri stated her findings were "inconsistent with the claimant's allegations." *Id.*

She recommended that speech and language therapy services were not necessary at the time. *Id.*

Later in March 2011, psychologist Seth Rigberg evaluated the Child at the request of the

Administration. *Id.* at 27, 463-466. Dr. Rigberg noted that the Child was appropriately dressed

with adequate hygiene, and he could eat with a spoon and fork and drink from a cup. *Id.* at 464-

465. However, he noted that the Child was unable to button, tie, or zip his own clothes, and

needed help washing himself. *Id.* at 465. Dr. Rigberg determined that the Child's social skills

were normal and his speech was age appropriate. The Child's attention and concentration were

also good, but his overall cognitive function was in the borderline range, with several skills

below average. In his medical source statement, Dr. Rigberg stated:

> Regarding his daily functioning, he may have some trouble attending
> to and following age appropriate directions, but he can understand
> them. He seems able to complete most age appropriate tasks. He has
> trouble adequately maintaining appropriate social behavior, but seems
> capable of responding appropriately to changes in his environment.
> It is unclear whether he is learning in accordance with his cognitive
> functioning. He does not always ask questions and request assistance
> in an age appropriate manner, but becomes frustrated. He seems to
> be aware of danger and takes needed precautions. He has trouble
> interacting adequately with peers and with adults.

*Id.* Dr. Rigberg diagnosed the Child with ADHD and borderline intellectual functioning. *Id.* at

466. He further concluded that the Child's psychiatric issues significantly interfered with his

ability to function on a daily basis. *Id.* at 465. Dr. Rigberg recommended counseling, evaluation

by a pediatrician to determine if medication would be helpful, and continued participation within

a special education program. *Id.* at 466.

In May 2011, D. Bostic, a state agency pediatric medical consultant and A. Herrick, A

State agency psychological medical consultant, reviewed the Child's record. *Id.* at 27, 480-485.

They each determined that at the time of their review, the Child's "impairment or combination of

impairments is severe, but does not meet, medically equal, or functionally equal the listings." *Id.*

at 480. Notably, in the evaluations, they cited several missing pieces of information, including a

teacher's evaluation and information about the Child's ADHD. *Id.* at 480-485. In the section on

"health and physical well-being," the evaluators noted only that the Child was "alleged disabled

due to asthma & 'eye turns in,'" but in the "attending and completing tasks" section, the

evaluators stated that the Child had "been referred to m.h. clinic, but thus far, no evaluation has

been done." *Id.* at 482-483. With no previous history of an ADHD diagnosis or teacher

evaluation, all the evaluators could state was that the consultative examiner recently diagnosed

the Child with ADHD. *Id.* It should be noted that this evaluation was conducted almost a full

twelve months before the ALJ conducted the hearing and evaluated the record.

Despite his outbursts and concern expressed by his teachers, the Child was declassified as

a special education student for the 2011-2012 school year, and placed in a regular classroom at

Marie Curie Institute for kindergarten. *Id.* at 27, 80, 626-629. The Guardian appealed the

declassification, and at the hearing before the ALJ, she expressed hopes that the Child would be

placed in a special education classroom for the next school year. *Id.* at 80-83, 626-629.

Dr. Barbara Samuels, M.D., evaluated the Child in September of 2011, as a referral due to

the Child's behavior difficulties at home and school. *Id.* at 28, 332-335. During testing, he was

fairly attentive and "quite personable," although sometimes distracted, fidgety, and "very much

all over the place." *Id.* at 333. Although Dr. Samuels described the Child's test results as "fairly

good" and noted he was "quite interactive," he scored in the maximum level of the ADHD

spectrum, displaying habits of occasional withdrawn behavior, sleep problems, attention problems, and aggressive behaviors. *Id.* at 333-334. Despite these results, Dr. Samuels was hesitant to diagnose ADHD until retrieving school information, so she diagnosed the him with having attention variation, social interaction variation, and sleep disturbances. *Id.* at 335. She suggested the grandparents may want to discuss starting the Child on a medication such as Clonidine,[6] but felt that the Guardian would also benefit from parenting help as well. *Id.* at 334-335. Dr. Samuels recommended appropriate school accommodations and "proper school placement," noting she could "imagine what a handful he must be in the regular classroom." *Id.* at 535. She also suggested that the Child may need speech therapy because he was not at his age level. *Id.*

On September 28, 2011, Dr. Saha met with the Child and the Guardian for an evaluation of ADHD following Dr. Samuel's evaluation. *Id.* at 536-537. Dr. Saha noted a speech delay. *Id.* On October 1, 2011, Dr. Saha wrote a prescription for Clonidine for the Child. *Id.* at 572. On October 24, 2011, Dr. Saha evaluated the Child again and the need to adjust the Clonidine dosage. *Id.* at 540-541.

In November 2011, Stacy Harting, M.S.,[7] a school psychologist employed by the Greater Amsterdam School District, evaluated the Child as part of the Guardian's appeal to the

---

[6]     Clonidine hydrochloride is the generic name for Kapvay, which is used for pediatric "[t]reatment of attention-deficit hyperactivity disorder as monotherapy and as adjunctive therapy to stimulant medications." http://www.pdr.net/drug-summary/kapvay?druglabelid=2283 (last visited Mar. 6, 2014).

[7]     In his decision, the ALJ refers to the opinions of both "Ms. Harting" and "Ms. Harding," which this court interprets to be the same person. (T. at 28.)

Committee on Special Education regarding the Child's declassification. *Id.* at 28, 626-629. She found that at the time of testing, the Child presented with Low Average cognitive functioning, but she believed that the results were in part a result of "behavioral concerns during testing." *Id.* at 628.

In February of 2012, Jennifer Young, Psy.D, evaluated the Child for his aggressive behavior towards peers and adults at home and in school. *Id.* at 28, 609-622. Specifically he "hits and kicks his grandmother, has slapped the teacher and called her 'bitch' . . . . Recently, [the Child] poked another child in the eye with a pencil. [The Child] also bangs his head, hits himself, and scratches himself. He will also threaten to kill others . . . . [The Child] also has difficulties sleeping at night and often awakes in the middle of the night screaming. The nightmares began when he was three years old after being exposed to domestic violence." *Id.* at 612. Ms. Young noted that during the assessment, the Child was hyperactive, aggressive, had difficulty sitting still, ran from the room, and hit his grandmother. *Id.* at 622. Dr. Young diagnosed him with ADHD, combined type, and assigned him a GAF score of 50, suggesting serious symptoms or serious impairment in social or occupational functioning. *Id.* at 615. She recommended individual and family therapy and appropriate placement in school. *Id.*

Dr. Samuels evaluated the Child again in April 2012, at which time she concurred with the diagnosis of ADHD and ODD. *Id.* at 641-645. In her letter to Dr. Saha, she reported concerns that she administered the Einstein Assessment of School-Related Skills for kindergarten test, and the Child did not pass for the second half of kindergarten. *Id.* at 641. She suggested starting the child on a psychostimulant because the Clonidine did not appear to be "holding" him. *Id.* at 642. She agreed with the Guardian that the Child would be better served in a special

education class.  *Id.* at 643.

In April 2012, the Child's kindergarten teacher, Ms. Manginelli, completed a teacher questionnaire about his behavior and learning level.  (T. at 401-409.)  Ms. Manginelli affirmed that she had known the Child for eight months and instructed him in reading, math, science, social studies, and health.  *Id.* at 402.  She indicated that there was an unusual degree of absenteeism, with thirty-seven unexcused absences and nineteen excused absences.  *Id.*

In the domain of "acquiring and using information," Ms. Manginelli rated the Child as having a serious problem in the areas of "comprehending oral instructions" and "understanding school and content vocabulary."  *Id.* at 403.  She rated the Child as having a very serious problem in the areas of "reading and comprehending written material;" "comprehending and doing math problems;" "expressing items in written form;" "recalling and applying previously learned material;" and "applying problem-solving skills in class discussions."  *Id.*  Ms. Manginelli further explained:

> [the Child] wants to be a good student and will sit in his seat and
> "try" to do the work given.  He will complete the task but will do it
> with inaccuracy.  He will scribble over it and make designs.  He is
> just learning to write his name.  When working in [a] small group
> he tries his best but the information is quickly forgotten.  When
> comparing a letter sound to another he is quickly confused even
> though we learned the sounds the previous day/hour.  He is able to
> learn but at a slow rate and he is inconsistent with retention.  When
> having a conversation with [the Child] he usually has a "wacky"
> story that relates to nothing we are doing and are obvious
> lies/stories and not the truth.

*Id.*

In the domain of "attending and completing tasks," she indicated the Child has a slight problem in "sustaining attention during play/sports activities."  *Id.* at 404.  She also indicated he

has an obvious problem in "paying attention when spoken to directly;" "refocusing to task when necessary;" "waiting to take turns;" and "working without distracting self or others." *Id.* She noted he has a serious problem in the areas of "focusing long enough to finish assigned activity or task" and "carrying out single-step instructions." *Id.* Finally, she indicated that he has a very serious problem in "carrying out multi-step instructions;" "changing from one activity to another without being disruptive;" "organizing own things or school materials;" "completing class/homework assignments;" "completing work accurately without careless mistakes;" and "working at [a] reasonable pace/finishing on time." *Id.* She indicated that the frequency of all of these problems was a daily basis. *Id.* Furthermore, Ms. Manginelli explained that "[h]e is very unengaged . . . [h]e needs lessons and directions repeated several times or needs to be monitored to make sure he is on task. He works best one on one or [in a] small group." *Id.*

In the domain of "interacting and relating with others," Ms. Manginelli noted a slight problem in the areas of "seeking attention appropriately" and "interpreting meaning of facial expression, body language, hints, sarcasm." *Id.* at 405. She indicated he has an obvious problem in "playing cooperatively with other children;" "making and keeping friends;" "asking permission appropriately;" "following rules (classroom, games, sports);" "respecting/obeying adults in authority;" "taking turns in a conversation;" and "using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation." *Id.* She indicated he has a very serious problem in the areas of "seeking attention appropriately;" "expressing anger appropriately;" "relating experiences and telling stories;" "using language appropriate to the language and listener;" and "introducing and maintaining relevant and appropriate topics of conversation." *Id.* Furthermore, she stated: "Socially, [the Child] want[s] to be a good friend

and enjoys socializing but he doesn't always make the right choices. He sometimes gets aggressive when he feels he has been wronged, sometimes someone is trying to be helpful but he has his own agenda." *Id.* She did note, however, that to a familiar listener, almost all of the child's speech can be understood on the first attempt. *Id.* at 406.

In the domain of "moving about and manipulating objects" Ms. Manginelli reported:

> [the Child] is able to grip a pencil but has great difficulty making straight lines and with writing. He is most comfortable with free drawing and shuts down when any kind of writing task is expected. He will put his head down [and] refuse to work and at times cry. He needs a lot of one on one and encouragement to complete the tasks that his peers are completing with accuracy. Coloring inside the lines is also a difficult task for [him].

*Id.*

In the domain of "caring for himself or herself," she noted no problem in personal hygiene and only a slight problem in "caring for physical needs (e.g. dressing, eating)," but deficiencies in other areas. *Id.* at 407. She noted he has a very serious problem with "knowing when to ask for help," explaining that she will give directions and model directions, and the Child will say he understands, but then the work is not done appropriately. *Id.* She indicated a serious problem in the areas of "handling frustration appropriately;" "using good judgment regarding personal safety and dangerous circumstances;" and "identifying and appropriately asserting emotional needs." She further explained: "[d]uring transition [the Child] gets carried away and swings things such as lunch box or folder/books. He doesn't consider the result of his actions until it's too late. He pushes/punches/swings things and does not like to be challenged especially when he feels he's right. He has hit me in the face." *Id.*

Ms. Manginelli expressed concern that the Child is not developing at a rate consistent with his peers, which has been compounded by his placement in an average-sized class. She

stated that "he needs quite a bit [of] individual attention academically that is difficult to provide with an average size around 27-28 students." *Id.* at 409. She noted that he works much better in a one-on-one environment, which they provide for his testing. However, she reported that he still has trouble retaining information, even in small group and one-on-one environments. *Id.*

## V. THE ALJ'S DECISION

Here, the ALJ found that the Child: (1) is not engaged in substantial gainful activity; (2) suffers from the severe impairments of ADHD, ODD, asthma, hearing loss, and estropia; (3) does not have an impairment that meets, or a combination of impairments that functionally equal, the severity of a Listing; and (4) is therefore not disabled. (T. at 25-35.)

## VI. THE PARTIES' CONTENTIONS

The Guardian claims that the ALJ erred in his determination of non-disability at the third step of the inquiry, finding the child's combination of impairments did not functionally equal the severity of a listing. (Dkt. No. 15 at 17.) Specifically, the Guardian claims that the ALJ erred by not finding a marked limitation in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, based greatly on the ALJ's failure to properly evaluate Ms. Manginelli's teacher questionnaire. *Id.* The Guardian also argues that the evidence supports a finding that the Child has marked limitations in the domains of moving about and manipulating objects, and caring for self. *Id.* Defendant contends that the ALJ's decision was determined by applying the correct legal standards, is supported by substantial evidence, and thus should be affirmed. (Dkt. No. 23.) For the reasons that follow, I recommend that this matter be remanded to the Commissioner for further proceedings consistent with this Report-Recommendation.

## VII.    DISCUSSION

The ALJ determined at the first sequential step of the inquiry that the Child is not engaged in substantial gainful activity.  (T. at 25.)  Neither party contests this finding.  The ALJ determined at the second sequential step that the Child suffers from the severe impairments of ADHD, ODD, asthma, hearing loss, and estropia.  *Id.*  Neither party contests this finding.  Plaintiff Guardian asserts that the ALJ erred in his determination of non-disability at the third step.  (Dkt. No. 15 at 17.)  She argues that the ALJ's finding of no marked limitation in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, was not supported by substantial evidence.  *Id.*  Plaintiff also argues the ALJ's finding of no marked limitation in the domains of moving and manipulating objects and caring for self was not supported by substantial evidence.  *Id.*  Specifically, Plaintiff argues that the ALJ incorrectly disregarded the opinion of the Child's teacher, Ms. Manginelli, in evaluating the domains.  *Id.*  Defendant does not address the ALJ's disregard for Ms. Manginelli's opinion.  The ALJ's lack of specificity as to why he disregarded Ms. Manginelli's opinion prevents this Court from properly reviewing the standard of law applied or whether the ALJ's determination was based on substantial evidence.  Therefore, remand is required.

Plaintiff Guardian presents a plausible claim that the ALJ failed to properly evaluate the whole record.  A full and fair hearing in accordance with beneficent purposes of the Social Security Act requires consideration of all relevant evidence.  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (a reviewing court must determine whether the ALJ adequately protected the claimant's rights by ensuring that all of the relevant facts were sufficiently developed and considered).  While an ALJ is entitled to resolve conflicts in the

evidentiary record, he or she cannot pick and choose only evidence that supports their particular conclusions. *See Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing *Fiorello v. Heckler*, 725 F.2d 174, 175-76 (2d Cir. 1983)). Such "cherry-picking" of opinions is improper. *See Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 439 (S.D.N.Y. 2009) ("In short, the ALJ cherry-picked some of the findings of the [doctor] -notably those that minimized plaintiff's . . . limitations - and ignored others. This was of course improper."). Here, Plaintiff argues that the ALJ failed to evaluate the whole record because he disregarded Ms. Manginelli's teacher questionnaire.

Defendant argues that it is "the Commissioner's discretion to evaluate the credibility of testimony and render an independent judgment in light of the medical findings and other evidence regarding the true extent of symptomology." (Dkt. No. 23 at 12) (citing *Mimms v. Secretary*, 750 F.2d 180, 186 (2d Cir. 1984); *Gernavage v. Shalala*, 882 F. Supp 1413, 1419 (S.D.N.Y. 1995)). Certainly "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Brault v. SSA,* 683 F.3d 443, 448 (2d Cir. 2012) (internal citations omitted). However, on appeal, the court only has the decision of the ALJ as insight into his or her application of the law. Here, when the ALJ discredited the Guardian's testimony, he articulated the factors considered in reaching that determination.[8] *See* T. at 26; *see also* SSR 06-03p, 2006 SSR LEXIS 5, at *11, 2006 WL 2329939, at *4-5 (a listing of the factors an ALJ should consider when weighing an opinion from an "other source," such as a teacher). However, the ALJ failed to articulate the factors he evaluated in determining Ms. Manginelli's credibility

---

[8]     Citation to the ALJ's determination of the Guardian's credibility is not an affirmation of that determination, but an indication that the ALJ was aware of the proper standard of law required to discredit a non-medical opinion.

and apparently did not consider her opinion of the Child at all.  *See id.* at 26-29.

As non-medical sources, or "other sources," teachers are "valuable sources of evidence for assessing impairment severity and functioning.  Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  SSR 06-03p, 2006 SSR LEXIS 5, at *8-9, 2006 WL 2329939, at *3.  Furthermore, "under certain circumstances" a teacher's opinion may "properly be determined to outweigh the opinion from a medical source, including a treating source."  2006 SSR LEXIS 5, at *14, 2006 WL 2329939, at *6.  "[A] teachers opinion cannot be dismissed solely because she is not an acceptable medical source, and instead the ALJ must consider all the relevant factors."  *Smith v. Astrue*, 10-CV-00053 GTS, 2011 U.S. Dist. LEXIS 31513, at * 17, 2011 WL 1113779, at * 5 (N.D.N.Y Jan. 20, 2011) (court found that the ALJ's failure to properly evaluate the opinion of a child's teacher warranted remand).

A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.  Here, the ALJ's failure to articulate the factors in his determination of Ms. Manginelli's opinion, or even acknowledge that her opinion was in the record[9], reasonably suggests that the proper legal standards were not applied and leads this Court to recommend remand.

If the ALJ did in fact properly consider all the relevant factors to determine Ms.

---

[9]     The ALJ inquired during the hearing as to the identity of the Child's current teacher, and the nature of the twenty-seven write-ups the Child had at that time in the school year.  (T. at 88-89.)

Manginelli's credibility, thereby applying the proper legal standard, he failed to show his calculations in the decision. An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). For example, in weighing an opinion from an "other source," the ALJ should consider how consistent the opinion is with other evidence in the record. 20 C.F.R. § 404.1527(d)(4). Here, although the ALJ cites certain statements made by psychologist Seth Rigberg, language pathologist Dawn Grasso-Megyeri, and Dr. Barbara Samuels that could be interpreted as inconsistent with Ms. Manginelli's opinion, the ALJ only mentions the school report to indicate testing levels for the Child. (T. at 32, 33, 34.) His decision does not reference Ms. Manginelli's statement which contains observations and reports of serious learning deficits and behavioral issues. *See id.* at 401-409. He fails to show any disconnect between Ms. Manginelli's opinion and the whole record that could explain his decision to disregard her opinion. If the ALJ in fact applied the correct legal standard and evaluated Ms. Manginelli's opinion under the appropriate factors, he must, on remand, articulate with more clarity any inconsistencies between her opinion and the rest of the record and explain his determination to disregard her opinion entirely.

Absent a legitimate reason to discredit Ms. Manginelli's opinion, her opinion could change the ALJ's determination with respect to the domains. She knew the Child for eight months prior to completing her assessment. *Id.* at 402. Had the ALJ properly considered all the relevant factors, this could have tended to support the teacher's conclusions concerning the Child's limitations across the domains. SSR 06-03p, 2006 SSR LEXIS 5, at *11, 2006 WL

2329939, at *4 (the ALJ should consider "[h]ow long the source has known and how frequently the source has seen the individual"). Furthermore, it appears that if the ALJ had correctly applied the factor test, the opinions of several other sources considered could have tended to support Ms. Manginelli's opinion. For example she reported that in the domain of "moving about and manipulating objects," the Child has significant difficulty writing, which is supported by Shannon Hinkle and Jennifer Greene-Gillooley's observations that he is in the 3rd percentile for Fine Motor Quotient. (T. at 231, 403.) Further, Ms. Manginelli's evaluation in the domain of "socializing and interacting with others," that the Child "enjoys socializing but he doesn't always make the right choices," is supported by the opinions of Drs. Samuel and Young. *Id.* at 405, 333-334, 465, 612-622. Moreover, Ms. Manginelli's opinion that the child needs to be placed in a special education environment more suited to his needs stemming from the domain of "attending and completing tasks" is consistent with the findings of nearly all the sources in the record, in varying degrees. *Id.* at 225-232, 233-239, 332-335, 401-409, 609-622, 643. These consistencies would conceivably weigh in favor of the teacher's opinion. 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

"Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams*, 859 F.2d at 258 (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630; *Richardson,* 402 U.S. at 401 (1971). Here, Plaintiff argues that the ALJ selectively chose facts to support his conclusion of no "marked" limitation in each domain. On remand, absent a legitimate reason to disregard Ms.

Manginelli's opinion, the ALJ should re-evaluate each domain, weighing the impact of her opinion on the overall evidence of the record, as related to each domain.

In *Smith*, the court noted that "by simply making a conclusory finding without any supporting evidence, the ALJ has frustrated the Court's ability to review his decision in order to determine whether it is supported by substantial evidence." *Smith*, 2011 U.S. Dist. LEXIS 31513, at *18, 2011 WL 1113779, at *5. Similarly here, this Court is unable to determine whether the ALJ applied the correct standard of law or if his finding of less than "marked" limitation in each of the six domains was based on substantial evidence. Therefore, on remand, the ALJ should consider and articulate all relevant factors in evaluating the opinion of Ms. Manginelli, and absent a legitimate reason to discredit her opinion, should re-evaluate each domain, weighing the impact of her opinion as it affects his determination of substantial evidence. Furthermore, should the ALJ find no reason to discredit Ms. Manginelli's opinion, he should also re-evaluate his discrediting of the Guardian's testimony, as Ms. Manginelli's opinion supports several of the Guardian's statements regarding the Child's behavior.

Accordingly, this matter should be remanded for consideration of Ms. Manginelli's report as it relates to the record as a whole.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[10] for further proceedings consistent with the above.

---

[10]     Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated: March 11, 2014
      Syracuse, New York


Thérèse Wiley Dancks
United States Magistrate Judge